UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DIANE CAGLE,                         )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    Case No. 2:13-CV-391-JD
                                     )
CAROLYN W. COLVIN,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## OPINION AND ORDER

On November 1, 2013, Plaintiff Diane Cagle filed her Complaint in this Court seeking

review of the final decision of the Defendant Commissioner of Social Security (Commissioner).

[DE 1.]  The Commissioner filed an Answer on January 14, 2014.  [DE 9.]  On March 7, 2014,

Cagle filed her opening brief [DE 15], to which the Commissioner responded on June 13, 2014.

[DE 21.]  Cagle filed a reply on June 27, 2014.  [DE 22.]  Accordingly, the matter is now ripe for

decision.  Jurisdiction is predicated on 42 U.S.C. § 405(g).

## I.  Procedural History

Cagle filed an application for disability insurance benefits on October 22, 2010.  (Tr.

137.)  Her application was denied initially on December 27, 2010, and again upon

reconsideration on March 31, 2011.  (Tr. 63, 70.)  On June 28, 2012, a hearing was held before

Administrative Law Judge Henry Kramzyk.  (Tr. 32.)  On July 11, 2012, ALJ Kramzyk issued a

decision denying the claim.  (Tr. 14-25.)  The Appeals Council denied a request for review on

October 1, 2013, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.).

## II. Facts

Cagle was born on March 24, 1961 and was 51 years old on the date the ALJ rendered his decision. (Tr. 24, 137.) Cagle alleges a disability onset date of October 2, 2010, mainly on account of her fibromyalgia and herniated discs in her back and neck. (Tr. 137-140.) The ALJ found that Cagle's severe impairments included degenerative disc disease, osteoarthritis of the right knee, fibromyalgia, depression, and anxiety. (Tr. 16.)

### A.  Medical Background

Cagle's medical evidence primarily revolves around her chronic pain. In February 2005, Cagle experienced back pain and a thoracic MRI revealed degenerative disc changes at T6-T7 and T7-T8 and disc osteophyte complex along the right parasagittal aspect of the canal at T9-T10. (Tr. 270.) In November 2006, her cervical MRI scan, taken on account of neck pain and right arm and leg numbness, showed early degenerative disc disease at C5-6 and C6-7. (Tr. 268.) The MRI of her thoracic spine showed shallow nuclear herniations causing mild mass effect on the cord at T6-T7, T7-T8, and T9-T10 without canal stenosis. (Tr. 506.)

In September 2008, treatment notes from the Interventional Spine and Pain Centers indicate that Cagle had previously sought treatment for her thoracic pain secondary to a disc herniation. (Tr. 355-376.) While those prior records were not provided, other records did indicate she sought treatment in September 2008 through mid-November 2009 with pain specialist Dr. Brian McClenic, M.D. for her right side pain, and her cervical and low back pain. Despite having a full range of motion in her spine, Dr. McClenic noted that her recent MRI showed advancement of cervical spondylosis and degenerative disc disease. Her treatment included Darvocet and epidural steroid injections with which improvement was noted in late 2008.

In June 2009, Dr. McClenic indicated that while the injections were helpful, Cagle's pain was returning and getting worse. (Tr. 355-376.)  He noted that she had a full range of motion in her spine with some tenderness. He also noted that she was taking Celebrex and Darvocet, and recommended that she repeat thoracic epidural injections.  With this course of treatment, Cagle showed signs of improvement, until November 2009 when the pain again returned.  Dr. McClenic referred her to a spine surgeon for further evaluation and recommended another thoracic epidural steroid injection which wasn't performed until June 2010—after Cagle first tried physical therapy and consulted a spine surgeon.[1]

In November 2009, Dr. Levin, of the Community Spine Neurosurgery Institute, reported that Cagle was a known acquaintance since she worked at the Community Hospital, and that she had been complaining for a number of years about back pain due to a work related incident in 2001. (Tr. 290-291.).  Dr. Levin indicated that her pain is on the right side and she reported tingling in her hands and trouble with dropping objects.  It was also documented that she had been undergoing physical therapy and injections, but that the insurance was not going to pay for further injections because they did not seem to have a significant effect.  Despite her having a good range of motion, his impression was that she suffered from thoracic disc pain and he ordered another MRI.  Cagle reported that she continued to work, but her pain was getting worse despite treatment. (Tr. 294-297.).

In June 2010, Cagle described her pain as being located in her neck and radiating to her right shoulder, arm and hand with associated numbness, tingling, and weakness. (Tr. 355-376.)  At this point she started seeing pain specialist Dr. Shariq Ibrahim and she underwent another

---

[1]It appears Cagle ultimately did not consider herself a good candidate for surgery; however, the ALJ did not discuss Cagle's reasons.

epidural injection in July, which helped, but she continued to experience right shoulder pain and hand weakness. Despite her persistent neck and radicular pain, in August 2010, Dr. Ibrahim indicated that Cagle received about 60% improvement, and therefore recommended no further interventions, except strength exercises and the addition of Savella.

In October 2010, it was noted that she could not tolerate the side effects of Savella and Cymbalta, and her pain had become more severe and her depression worse. It was also noted that her cervical range of motion was diminished. As a result, Dr. Ibrahim started her on Lexapro and recommended that she see a psychologist for nonpharmacological methods to help her cope with her pain.

Also in October 2010, Dr. McIntire, Cagle's treating physician since at least early 2005 (Tr. 270), noted that Cagle's neck and back pain were constant, chronic, and severe, and that she could not sleep at night due to the pain and she was becoming more and more depressed by having to call off of work more frequently. He noted that she recently dropped a bottle of laundry detergent because of her pain, and she had to stand up and shift positions to get comfortable. He also noted her normal range of motion in her neck and back. Dr. McIntire opined that she suffered from fibromyalgia and chronic pain.

On November 30, 2010, consultative examiner J. Smejkal, M.D. noted that despite spinous and paraspinal tenderness throughout the spine, Cagle had a full range of motion and no restrictions. (Tr. 403-406.) She reportedly had normal grip strength with fine finger manipulative abilities. It was his impression that Cagle suffered from a history of depression and herniated discs in the lumbar and cervical spine, with pain but no restrictions, but there was a need to rule out fibromyalgia.

On December 22, 2010, state agent J. Sands, M.D., reviewed Cagle's file and found that while Cagle appeared credible, the evidence indicated that her impairments were not severe. (Tr. 410.) State agent D. Neal, M.D., affirmed this opinion in March 2011. (Tr. 435.)

Also in December 2010, state agent Kari Kennedy, Psy.D., performed a psychiatric review technique and concluded that Cagle suffered from major depressive disorder and bereavement (Tr. 411-428.) He opined that Cagle had mild restrictions in her activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence, and pace, and no episodes of decompensation. Psychologist Kennedy also performed a mental RFC[2] assessment which indicated that the only limitations Cagle faced was moderate limitations with maintaining attention and concentration for extended periods, interacting with the general public, and responding appropriately to changes in the work setting. Despite these findings, he indicated that Cagle was "able to deal with changes in a routine work setting" and was capable of unskilled work. On March 25, 2011, reviewing state agent Joelle Larsen, Ph.D., affirmed the opinion. (Tr. 434.)

In June 2011, Dr. McIntire ordered MRI imaging of Cagle's spine. (Tr. 468.) MRI imaging of the cervical spine revealed spondylotic changes at C5-C6 and C6-C7, and minimal central stenosis at C5-C6. (Tr. 468.) MRI imaging of the thoracic spine revealed small disc bulges and protrusions. (Tr. 469.) MRI imaging of the lumbar spine revealed mild degenerative disc and facet disease, mild left lateral recess compromise, and mild left lateral recess compromise. (Tr. 471.)

---

[2]Residual functioning capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

Dr. McIntire also examined Cagle and observed tender points in the elbows, upper back, and legs, along with tightness from the neck to the lumbar area. (Tr. 467.) Dr. McIntire opined that Cagle suffered from early arthritis, a bulging disc in the upper back, and slippage of the cervical spine. (Tr. 467.)

For purposes of benefits, Dr. McIntire submitted an assessment of Cagle's functional capacity in June 2011, stating that she suffered from fibromyalgia and neck and back pain that caused abnormal motion with joint pain and stiffness. (Tr. 453-454.) He indicated that Cagle's pain could be as severe as a 9 on a 10 point scale, and that it was aggravated by bending, lying down, twisting, and sitting. He also opined that the pain moderately interfered with Cagle's concentration, preventing her from performing complicated/detailed tasks. He concluded that she was unable to perform simple gripping, pushing or pulling, and fine manipulation with the right hand, nor could she perform repetitive motions with her right hand. She could lift and carry up to 10 pounds frequently, up to 19 pounds occasionally, and between 20 and 49 pounds rarely. Furthermore, he concluded that she could sit for less than 4 hours in an 8 hour day, provided that she was allowed to change positions at will from sitting and standing, that she could stand or walk for less than 1 hour in an 8 hour day, and that she could never bend, squat, crawl, climb, or reach above shoulder level.

Four months later, on October 14, 2011, Cagle was examined by Dr. Kevin Joyce, a rheumatologist, who observed "irritability for range of motion of the cervical spine" and found 18 of 18 positive soft tissue tender points, consistent with her diagnosis of fibromyalgia. (Tr. 566). Dr. Joyce opined that she obviously suffered from active depression, and that she may have a sleep disorder for which he recommended further work-up. Days later, he saw Cagle

again, and his assessment listed the following problems: fibromyalgia, arthralgias in multiple sites, fatigue, obstructive sleep apnea, osteoarthritis, and emphysema. (Tr. 558.)

Dr. Joyce noted in November 2011 that her current "active" problems included in relevant part, arthralgias in multiple sites, arthritis, depression, emphysema, fatigue, fibromyalgia, herniated cervical disc, myalgia and myositis, and neck pain. (Tr. 553-554.) He noted that she had some irritability for range of motion of the cervical spine, but no major limitations. His treatment plan for Cagle indicated that she continued to have widespread pain and he would need to address her fibromyalgia syndrome more completely. Subsequently, Cagle's sleep evaluation indicated that she suffered from mild sleep apnea syndrome. (Tr. 590-594.)

In late November 2011, Dr. McIntire documented that Cagle suffered from depression and fibromyalgia. (Tr. 587.) In January 2012, Dr. McIntire noted that Cagle attempted to stop smoking and started using a treadmill because she was gaining weight, but then her pain returned. (Tr. 610.) He also noted that she did not want any muscle relaxants or other pills, and that she was trying to wean herself off of the Vicodin. (Tr. 611.)

Cagle's medical records further include frequent notations of her depression. At one point, Dr. McIntire noted that her prior psychiatric treatment records were not kept by St. Catherines. (Tr. 455.) However, the record does show that in October 2010, Drs. Ibrahim and McIntire both noted that Cagle appeared depressed. (Tr. 355, 379.) Also, on July 15, 2011, Dr. McIntire noted that Cagle tearfully told him that she had not been sleeping well because of pain and stress, and that she felt lonely since her husband's sudden death in September 2007. Sometimes Cagle did not want to wake up from sleep. (Tr. 463.) This prompted Dr. McIntire to diagnose Cagle with acute depression and contacted Cagle's son to take her to the emergency

room for mental health treatment. (Tr. 463.) Cagle's son took her to the hospital, where she was admitted for the day and diagnosed with major depressive disorder. (Tr. 444-45.) In August 2011, clinical nurse specialist Patricia Lennon diagnosed Cagle with major depressive disorder and general anxiety disorder. (Tr. 530.) Ms. Lennon indicated Cagle should continue Alprazolam and start Citalopram.

Consultative psychologists Drs. J. Singh and Harry Gunn conducted a mental status examination of Cagle on November 30, 2010, for the purpose of disability benefits. (Tr. 399-402.) They found that Cagle's mood was depressed and she suffered from drowsiness due to her medications. They noted that while Cagle was generally able to take care of her personal needs, she has had chronic back pain since 2002 and bouts of depression since her husband's death in 2007. Drs. Singh and Gunn diagnosed Cagle with major depressive disorder (recurrent, moderate), bereavement (chronic, severe), fibromyalgia, and chronic back and shoulder pain.

## B.     Cagle's Hearing Testimony

Cagle testified that she completed the tenth grade and previously worked for ten years as a housekeeper and twelve years as a food preparer and server. (Tr. 38-41.)   Cagle indicated that she recently was diagnosed with emphysema, and she is very depressed and suffers from anxiety. (Tr. 42.) She indicated that she also suffers from severe pain caused by slipped discs and fibromyalgia. (Tr. 42.) She testified that her pain ranged from her knees through her hips and into her back, neck, and elbows. (Tr. 43.) She rated her pain as typically between a 7 or 8 on a 10-point scale, and indicated that physical activity made it worse. (Tr. 43, 51.) In addition, she experienced numbing and tingling in her hands after holding an object for just a few minutes. (Tr. 43, 52.) Cagle testified that her pain medications cause her to feel tired, but then she cannot sleep at night. (Tr. 44.) Cagle stopped receiving epidural steroid injections and seeing her

psychiatrist because she could not afford the treatment anymore after losing her insurance. (Tr. 44.)

Cagle testified that she had difficulty lifting a gallon of milk and that she could walk for only 10 minutes before needing to rest, and sit for only 5 minutes before needing to change positions. (Tr. 44-45.) Cagle stated that she did little housecleaning and was unable to vacuum, and she frequently remained in her pajamas all day. (Tr. 46-47.) Any housework she performed was with breaks. (Tr. 46.) Cagle said she spent up to half of every day lying down with a heating pad due to her pain. (Tr. 51-52.) Cagle explained that she shopped for groceries once each month and had no hobbies, occasionally interacted with friends and family, and kept the television on as "noise" but found it difficult to focus on shows. (Tr. 47-48, 50-52.) Cagle said she was frequently anxious and depressed and that she felt scared living by herself. (Tr. 42.)

## C.     Vocational Expert's Hearing Testimony

The Vocational Expert (VE) indicated that Cagle's past work consisted of unskilled, medium to heavy exertional work. (Tr. 55.) In addition, the ALJ questioned the VE about the availability of jobs for a hypothetical individual of Cagle's age, education, and work experience who retained the RFC to lift/carry/push/pull twenty pounds occasionally and ten pounds frequently; sit for six hours; stand/walk for six hours; could never kneel, crawl, or climb ropes, ladders or scaffolds; could occasionally balance, stoop, crouch, and climb ramps and stairs; could understand, remember, and carry out short, simple, repetitive instructions; could sustain attention and concentration for two hour periods and for eight hours total; could make decisions related to short, simple, repetitive instructions; could have occasional contact with supervisors and coworkers and superficial contact with the public on routine matters; required few changes during the workday; and could not perform fast-paced production work. (Tr. 56-57.)

The VE testified that while the individual could not perform Cagle's past relevant work, she could perform the jobs of encapsulator, wire prep machine tender, inspector, and housekeeper.  (Tr. 57.)  However, if the individual had to miss three or four days of work a month, or needed an extra two hour break, she could not sustain competitive employment. (Tr. 58-59.)

**D.    The ALJ's Decision**

The ALJ made the following findings: Cagle suffered from severe, non-listing level, impairments that included degenerative disc disease, osteoarthritis of the right knee, fibromyalgia, depression, and anxiety.  (Tr. 16-17.)  Her mental impairments produced mild difficulties in activities of daily living and moderate difficulties in social functioning and concentration, persistence, or pace.  (Tr. 17-18.)

The ALJ found that Cagle retained the RFC to perform work at the light exertional level with the same restrictions that were posed in the first (and only) hypothetical to the VE.  (Tr. 18-19.)  The ALJ determined that Cagle's statements regarding the intensity, persistence, or limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment, and noted that there were various factors needing consideration in assessing a claimant's credibility under SSR 96-7p. (Tr. 20.)   Specifically, the ALJ determined that Cagle was not entirely credible with respect to her allegations of pain and fatigue, her hand limitations, and her alleged mental impairments.

In making his disability assessment, the ALJ gave the opinions of non-examining and non-treating state agency psychological consultants Drs. Kennedy and Larson substantial weight; the opinions of consultative state agents Drs. Sands and Neal only some weight (given that evidence submitted after their review indicated Cagle had some physical limitations), and the

10

June 2011 opinion of treating physician Dr. McIntire little weight, explaining that he was only a general practitioner and his opinion was not consistent with his own treatment notes which repeatedly documented Cagle's full range of motion.  (Tr. 23.)

### III.  Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review.  *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision.  *Id.*  An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  Consequently, an ALJ's decision cannot stand if it lacks

evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Cagle essentially challenges the ALJ's decision on three grounds: (1) that the ALJ failed to properly analyze the June 2011 opinion of Dr. McIntire; (2) that the ALJ failed to properly analyze Cagle's credibility; and (3) that the ALJ failed to make a proper RFC assessment (by not sufficiently considering her fatigue, hand limitations, and need to change positions). The Court finds that the ALJ's opinion is not adequately supported in all of these respects, and therefore remand is required because these errors affect the ultimate determination of whether Cagle can perform work.

## A.    Dr. McIntire's June 2011 Assessment

Recall that in June 2011 Dr. McIntire believed Cagle was extremely limited with her right arm, and could only sit less than 4 hours and stand/walk less than 1 hour during an 8 hour day, and she needed to be able to change positions at will. The ALJ afforded Dr. McIntire's June 2011 assessment "little weight" simply because he is a general practitioner and because Dr.

McIntire's opinion was not consistent with his own treatment notes that Cagle had a "full range of motion." (Tr. 23.) But this explanation is insufficient.

The parties do not dispute that Dr. McIntire was Cagle's treating physician. A treating physician's opinion is entitled to controlling weight if it is supported by medical evidence and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c). When the treating physician's opinion is *not* entitled to controlling weight, however – such as where it is not supported by the objective medical evidence, where it is inconsistent with other substantial evidence in the record, or where it is internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)) – then the ALJ should move on to assessing the value of the opinion in the same way he would any other medical evidence. *See* 20 C.F.R. § 404.1527(c)(2). Assessing what weight to afford the opinion depends on a number of factors, such as the examining relationship (with more weight given to an opinion of an examining source); the treatment relationship, which includes the length, frequency, and nature of the treatment; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the opinion. 20 C.F.R. § 404.1527(c); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). If the ALJ discounts the treating physician's opinion after considering these factors, his decision must stand as long as he "minimally articulated his reasons—a very deferential standard that we have, in fact, deemed lax." *Elder*, 529 F.3d at 415 (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).

Here, the ALJ committed reversible error by paying too little attention to the factors listed in § 404.1527(c) when deciding to afford little weight to Dr. McIntire's opinion. While

the ALJ indicated that Dr. McIntire was Cagle's treating general practitioner, he did not bother to note that Dr. McIntire had been treating Cagle continuously for her pain since 2005. Moreover, his examinations and work-up of Cagle's condition over the years has been extensive.

The government's reliance on *Elder* in support of the ALJ's providing Dr. McIntire's opinion little weight is misplaced. In *Elder*, the ALJ discounted the treating physician's opinion because he was not a rheumatologist and because he never confirmed the severity of Elder's fibromyalgia with medical examinations or tests. *Id*. at 416. In other words, while the doctor may have seen Elder every two and a half months, the Seventh Circuit reasoned that he "did nothing to assess the severity of [Elder's] ailments; indeed, [the doctor] offered only general palliative care in the form of pain mediation and medical excuses from work." *Id*.

The same simply cannot be said of Dr. McIntire. While it is true that Dr. McIntire is not a rheumatologist, no one disputes that Cagle suffered from fibromyalgia and was treated by Drs. McIntire and Joyce for the same. Even the ALJ listed fibromyalgia as one of Cagle's severe impairments. More importantly though, Dr. McIntire has physically examined Cagle on numerous occasions over the course of almost a decade, ordered various MRI tests of her spine, and continually treated Cagle's pain since 2005. Dr. McIntire not only conducted various physical examinations of Cagle, he also monitored her progress while she received additional treatment from pain specialists and a rheumatologist. So unlike the treating physician in *Elder*, it cannot be said that Dr. McIntire did nothing to assess the severity of Cagle's ailments, and thus, the ALJ was not similarly justified in rejecting Dr. McIntire's opinion.

The ALJ committed further error by summarily rejecting Dr. McIntire's June 2011 assessment because Dr. McIntire's other treatment notes consistently noted that Cagle had a full range of motion. The ALJ impermissibly "played doctor" in this respect, because there is no

testimony or medical evidence indicating that simply because Cagle often had a full range of motion, she could not suffer from further limitations—such as the need to alternate between sitting and standing on account of pain and/or the need to be limited in the total time spent sitting or standing/walking. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

In Cagle's case, the ALJ failed to observe that despite oftentimes having a full range of motion in her spine, like Dr. McIntire, both Drs. McClenic and Levin reported in 2008 and 2009 that Cagle still suffered from terrible chronic pain, requiring her to take pain medication, undergo physical therapy, and endure repeated thoracic epidural steroid injections. Even after undergoing this treatment, the pain returned five or six months later. In fact, in November 2009, it was documented that despite having a good range of motion, it was recommended that Cagle consult with a spine surgeon. So to discount Dr. McIntire's assessment merely because his and other treatment notes reflected Cagle's having a full range of motion in her spine, is unsupported by Cagle's extensive treatment for ongoing and debilitating pain.

Furthermore, the ALJ improperly disregarded more recent objective evidence revealing that Cagle's continuous and progressive pain began to result in Cagle's actually having a diminished range of motion. Specifically, in October 2010, consistent with Cagle's onset date, Dr. Ibrahim noted that Cagle's cervical range of motion was diminished, her pain had become worse, and she needed to see a psychologist to help her cope with her pain. At that time it was also noted by Dr. McIntire that Cagle had to shift positions to get comfortable. And a year later, Dr. Joyce also noted Cagle's irritability for range of motion in her cervical spine, and indicated she was suffering from fibromyalgia, arthralgias in multiple sites, myalgia and myositis, and neck pain. Yet, in discounting Dr. McIntire's opinion, no explanation was provided by the ALJ

about whether these medical observations would have supported Dr. McIntire's June 2011 restrictive assessment of Cagle.

As far as discernible from this record, the ALJ simply engaged in his own lay view of the limitations caused by Cagle's severe impairments of degenerative disc disease and fibromyalgia, and the resulting chronic pain, without expressly relying on any medical evidence or authority. Again, only the ALJ surmised that a full range of motion in the spine meant that Cagle wasn't further restricted by her pain.

This is also true with respect to Cagle's reported right arm/hand limitations. Specifically, Dr. McIntire opined in June 2011 that Cagle's right upper extremity was limited and she could not reach above shoulder level. In addition, other records documented Cagle's suffering from problems with her upper extremities: in November 2006, it was noted that Cagle suffered from right arm numbness; in September 2008, Dr. McClenic indicated that she complained of right side pain; in November 2009, Dr. Levin reported that she had tingling in her hands and trouble with dropping objects; in June 2010, Dr. Ibrahim noted that her pain was located in her neck and radiated to her right shoulder, arm and hand with associated numbness, tingling, and weakness; and, in October 2010, it was noted that sensation in her right arm was diminished and she had dropped a bottle of laundry detergent because of her pain.

But in discounting Dr. McIntire's belief (and Cagle's testimony) that she suffered from upper extremity limitations, the ALJ did not include a discussion of these records; rather, the ALJ only relied on the November 30, 2010, consultative examination during which Dr. Smejkal opined that Cagle had normal grip strength and full range of motion in her upper extremities with full strength. Much like the ALJ is not permitted to substitute his own judgment for that of the medical witnesses, he is also not allowed to omit consideration of much of the evidence

favoring Cagle and supporting the June 2011 assessment of Dr. McIntire, while relying only on the records indicating Cagle was doing well. *See* 42 U.S.C. § 423(d)(5)(B) (indicating ALJ's are required to consider all relevant evidence in the record in determining whether an individual is disabled); 20 C.F.R. § 404.1527(c); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding).

In sum, the ALJ has not sufficiently supported his determination that Dr. McIntire's opinion was not entitled to controlling or significant weight as a treating source. Accordingly, remand is necessary for the ALJ to properly analyze and explain the weight to be afforded to the opinion of Dr. McIntire. The ALJ's analysis in this respect is especially important in a case like this, where had the ALJ determined that Cagle's ability to stand/walk/sit was limited to a sedentary exertional level, rather than light, the ALJ would have been directed to find Cagle disabled. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.09.

## B.    Cagle's Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how her symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). While subjective allegations of disabling symptoms alone cannot support a finding of disability, *id.*, the ALJ must consider the claimant's subjective complaints, the relevant objective medical evidence, and other factors relevant to a claimant's symptoms, such as pain, including:

(1) The individual's daily activities;
(2) Location, duration, frequency, and intensity of pain or other symptoms;
(3) Precipitating and aggravating factors;

18

(4) Type, dosage, effectiveness, and side effects of any medication;
(5) Treatment, other than medication, for relief of pain or other symptoms;
(6) Other measures taken to relieve pain or other symptoms;
(7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96–7p.

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, SSR 96–7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96–7p. Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . [the] court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir. 2004)).

In this case, the ALJ determined that Cagle was not entirely credible with respect to her allegations of pain and fatigue, her hand limitations, and her alleged mental impairments. While the ALJ did refer to many of Cagle's medical records and acknowledged that her pain was made worse with physical activity and sitting, the ALJ's credibility finding on remand—even if not necessarily an independent basis requiring remand—should include a discussion of the various other factors relevant to Cagle's pain and fatigue. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96–7p.

For instance, although the ALJ found that Cagle only suffered mild limitations in her daily activities, he did not discuss the fact that many of her activities were restricted, that she needed breaks while completing tasks, and that she had to lay down for about half of the day with a heating pad due to her pain. *See Clifford v. Apfel*, 227 F.3d 863, 870-72 (7th Cir. 2000)

(the ALJ should have explained the inconsistencies between the claimant's activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence).  In addition, Cagle's medical records evidence her persistent problem with being unable to sleep, and the ALJ noted that she had mild sleep apnea syndrome.  However, the ALJ did not sufficiently explain why Cagle's unrebutted fatigue and need for naps did not support her claimed limitations and inability to work. *See Cuevas v. Barnhart*, No. 02 C 4336, 2004 WL 1588277, at *15 (N.D. Ill. Dec. 29, 2004) (the ALJ erred by failing to address unrebutted evidence that claimant needed to take naps during the day); *Holland v. Barnhart*, No. 02 C 8398, 2003 WL 22078383, at *9 (N.D. Ill. Sept. 5, 2003) (by failing to discuss the claimant's fatigue and how it might affect her job performance, the court was precluded from evaluating whether there was substantial evidence to support the ALJ's finding).

Another factor to be considered in assessing a claimant's credibility, is the type, dosage, effectiveness, and side effects of any medication, as well as other treatment used to relieve pain and other symptoms. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96–7p.  But here, the ALJ did not discuss the side effects of Cagle's pain medication, nor the fact that her epidural injections failed to provide full relief, with the pain getting even worse after several months.  Also problematic, is the ALJ's discrediting Cagle's self-reported limitations because she had "gaps in her conservative treatment," without also discussing Cagle's reasons for not undergoing surgery and considering the evidence suggesting that Cagle did not have the funds to obtain needed treatment. *See e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citations omitted); SSR 96-7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular

medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").  While it is true there is an inherent difficulty with evaluating testimony about pain, *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006), on remand a more extensive credibility analysis would be helpful in assessing whether the ALJ is justified in finding Cagle's testimony about pain and fatigue exaggerated.

**C.    Cagle's RFC**

The ALJ must determine an individual's RFC, or "what an individual can still do despite his or her limitations," SSR 96–8p, based upon medical evidence as well as "other evidence, such as testimony by the claimant." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted).  In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, "even [limitations] that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Id*. (quoting *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

Here, the ALJ's insufficiently supported discussion of Dr. McIntire's opinion affected the ALJ's RFC findings about the extent of Cagle's limitations.  Until the ALJ supplies sufficient reason to discount Cagle's treating physician's opinion, the Court is unable to conclude that the RFC is supported by substantial evidence. *See Schmidt v. Astrue*, 496 F.3d 833, 843-46 (7th Cir. 2007) (noting the ALJ must consider the entire record, consider the claimant's testimony, weigh the physicians' opinions, and support his RFC finding by substantial evidence).  In addition, a more extensive credibility analysis, as discussed above, would lend further support to the ALJ's RFC assessment.  As a result, on remand the ALJ must reconsider whether Cagle would have further limitations, especially with respect to her upper extremity limitations and her ability to

sit, stand, and walk without breaks/naps or alternating positions, and the ALJ shall explain how Cagle's credible abilities and limitations were accounted for in the RFC assessment.

## D. Cagle's Ability to Perform Work

The ALJ found that Cagle could not perform her past work because she was limited to light exertional work (step four), but she was able to perform other jobs that existed in significant numbers in the national economy (step five). In deciding what work Cagle was capable of performing, the ALJ relied on the VE's testimony, which in turn relied on the ALJ's hypothetical question—which was ultimately premised on the ALJ's RFC determination.

The ALJ is required to incorporate into his hypotheticals those impairments and limitations that he accepts as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Here, the ALJ's insufficiently supported RFC findings about the extent of Cagle's limitations led the ALJ to ask a hypothetical of the VE based upon only some, as opposed to all, of Cagle's complaints.[3] Once the ALJ provides adequate support for his RFC findings, which can then be used as the basis of the hypotheticals, the Court can assess whether a VE's testimony can be relied upon as an accurate indicator for the type of work Cagle is capable of performing. But because it is the ALJ's duty to assess the weight to be afforded to the record evidence and to determine the claimant's actual limitations and resulting RFC, 20 C.F.R. §§ 404.1520(e),

---

[3]Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE never indicated having reviewed Cagle's medical records, including those of Dr. McIntire, nor did he indicate in his responses having relied on those records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, rather than on the record itself or the limitations of the claimant herself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

404.1545, 404.1546(c), steps four and five cannot be properly analyzed in this appeal. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); SSR 96-8p.  The remedy for these shortcomings is further consideration, not an award of benefits.

### V.  Conclusion

For the foregoing reasons, the Court DENIES Diane Cagle's request that the Court find that she is entitled to disability benefits but GRANTS her request to remand the ALJ's decision. [DE 1.]  Accordingly, the Court now REMANDS this case to the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED.

ENTERED:  January 29, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court